# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ABEL RITCHIE,                                 :

                     Plaintiff,

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.                      :

Case No. 3:10-cv-152

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g), as incorporated into 42 U.S.C. §1383(c)(3), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for supplemental security income SSI benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits

prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 . If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff previously filed two applications for SSI in October, 2004, and September, 2005. (Tr. 119-21, 126-28). The Commissioner denied those applications at the initial and reconsideration levels and Plaintiff took no further appeal. (Tr. 67-69, 85-96). Plaintiff again filed an application for SSI on November 3, 2006, alleging disability from September 5, 2001, due to asthma, social phobias, panic attacks, and nerve problems. *See* Tr. 129-31; 214. The Commissioner denied those applications at the initial and reconsideration. *See* Tr. 65-66, 73-80. Administrative Law Judge Amelia G. Lombardo held a hearing, (Tr. 21-64), and subsequently determined that

Plaintiff is not disabled. (Tr. 9-20). The Appeals Council denied Plaintiff's request for review, (Tr. 1-4), and Judge Lombardo's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Lombardo found that Plaintiff has severe borderline intellectual functioning, anxiety, and depression, but that he does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 11, ¶ 2; Tr. 12). Judge Lombardo also found that Plaintiff has the residual functional capacity to perform work at all exertional levels, but that he had non-exertional restrictions of being limited to simple unskilled tasks, jobs that require no more than minimal contact with the general public, and low stress jobs that do not involve assembly lines or production quotas. (Tr. 14, ¶ 3). Judge Lombardo then used section 204.00 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 18-19, ¶ 8). Judge Lombardo concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 19, ¶ 9).

In his Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to his alleged exertional impairments. (Doc. 9). Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged mental impairments.

Plaintiff's teachers suspected that Plaintiff had Attention Deficit Hyperactivity Disorder ("ADHD") that had been interfering with his behavior control in the classroom and therefore Plaintiff was evaluated by a school psychologist in August, 1990, when he was ten years old. (Tr. 162-64). The psychologist reported that Plaintiff's IQ was measured on the Stanford-Binet Intelligence Scale (4th Ed), which resulted a composite test score 76, a verbal reasoning score of 64, abstract/visual reasoning score of 80, a quantitative reasoning score of 87, and a short-term memory

score of 84. *Id.* The psychologist also reported that results of the Vineland Adaptive Behavior Scales-Interview Edition score was fifty-three. (Tr. 164). The psychologist reported further that Plaintiff's adaptive behavior scores were considerably below his overall intellectual functioning, but were more in line with his language verbal reasoning functions from the mental ability subtest. *Id.* The psychologist noted that he had spoken with Plaintiff's mother about giving Plaintiff more individual responsibility at home and expecting a greater level of maturity in his day-to-day living which, the psychologist opined, was well within Plaintiff's overall capability. *Id.*

In 1994, when Plaintiff was fourteen years old, the school psychologist reported that the Wechsler Intelligence Scale for Children-III indicated that. Plaintiff's verbal IQ was 66, his performance IQ was 66, and his full scale IQ was 64, placing Plaintiff in the mildly mentally retarded range. (Tr. 155-60). The psychologist also reported that Plaintiff obtained a composite score of 68 on the Vineland Adaptive Behavior Scales *Id.* The psychologist concluded that based on these scores, Plaintiff's communication skills were low, his daily living skills were moderately low, and his socialization skills were low. *Id.*

Examining psychologist Dr. Bonds reported on January 21, 2005, that Plaintiff's speech was normal, his mood seemed mildly depressed, his affect was broad and appropriate to thought content, and that he seemed nervous and tense during the interview. (Tr. 311-19). Dr. Bond also reported that Plaintiff was alert and oriented, had sufficient information, judgment, and reasoning abilities to make important decisions, and that his interest, motivation, and effort during testing were good. *Id.* Dr. Bonds reported further that results of the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) indicated that Plaintiff's full scale IQ was 68, his verbal IQ was 71, and his performance IQ was 70. Dr. Bonds opined that chances were 95 out of 100 that upon

5

subsequent testing, Plaintiff would validly obtain a full scale IQ between 65 and 73. *Id.* Dr. Bonds reported that he found no significant difference between Plaintiff's performance and verbal IQ scores. *Id.* Dr. Bonds noted that results of the Wechsler Memory Scale-Third Edition (WMS-III) revealed that Plaintiff's immediate and general memory indexes were in the borderline range and that his working memory index was in the extremely low range of functioning. *Id.* Dr. Bonds identified Plaintiff's diagnoses as social phobia and borderline intellectual functioning and he assigned Plaintiff a GAF of 60. *Id.* Dr. Bonds opined that Plaintiff's ability to relate to peers, supervisors, or the public was mildly limited; his ability to understand, remember and follow instructions was moderately limited; his ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks was not significantly limited; and that his ability to withstand the stress and pressure associated with day-today work activities was moderately limited. *Id.*

The record contains treatment notes from Plaintiff's primary care physician, Dr. Kinkopf, dated from November, 1982 to December, 2008. (Tr. 346-56, 401-49, 476-81, 505-51, 584-648). Dr. Kinkopf's treatment notes reveal that he treated Plaintiff for various conditions and complaints including headaches, "nerves", anxiety, sleep disturbance, and difficulty with anger. *Id.* In various treatment records from February through July, 2007, Dr Kinkopf noted that Plaintiff appeared anxious, was tearful and depressed, that Plaintiff reported that he had taken multiple medications, but that nothing helped and he was unable to control his moodiness, and his heart raced. *Id.*

Over time, Dr. Kinkopf completed numerous Basic Medical Forms. In these forms, Dr. Kinkopf consistently identified Plaintiff's diagnoses as chronic anxiety, asthma, social phobias,

6

and panic attacks, and he consistently opined that Plaintiff was "unemployable." (Tr. 346-49, 545-49, 579-83, 665-66). In August, 2006, Dr. Kinkopf opined that in twenty areas of job related mental functioning, Plaintiff was not limited in six areas, was not significantly limited in three areas, was moderately limited in ten areas, and was markedly limited in the ability to carry out detailed instructions. (Tr. 546-47). In May, 2007, Dr. Kinkopf opined that Plaintiff was not significantly limited in six areas of job related mental functioning, was moderately limited in ten areas, and was markedly limited in four areas, including remembering locations and work-like procedures, and understanding and remembering very short and simple instructions. (Tr. 582-83).

On October 29, 2005, examining psychologist Dr. Deardorff reported Plaintiff' flow of conversation and thought were normal, he appeared to be anxious, was preoccupied with his difficulties, was alert and oriented, and that his judgment appeared to be sufficient for him to make decisions affecting his future and to conduct his own living arrangements efficiently. (Tr. 450-55). Dr. Deardorff also reported that Plaintiff's results on the WAIS-III revealed that Plaintiff's full scale IQ was 62, his verbal IQ was 65, and his performance IQ was 64. *Id.* Dr. Deardorff noted that Plaintiff's tested IQ is slightly lower than would be expected on the basis of his clinical presentation, but that the results were consistent with his special education background. *Id.* Dr. Deardorff, reported further that emotional factors may have interfered with Plaintiff's performance as he appeared to function at the mildly retarded to borderline intelligence level. *Id.* Dr. Deardorff identified Plaintiff's diagnoses as depression, panic disorder with agoraphobia, and borderline intellectual functioning; he assigned Plaintiff a GAF of 45. *Id.* Dr. Deardorff opined that Plaintiff "would very likely have difficulty relating adequately to others in completing simple repetitive tasks"; he would have no difficulty understanding simple instructions, but "his short-term skills are

7

weak and he may have difficulty retaining them", his ability to maintain attention, concentration, persistence and pace is moderately impaired by his emotional difficulties, and his ability to withstand the stress and pressure associated with day-to-day work activity is seriously impaired by his emotional difficulties. *Id.*

The record contains Plaintiff's mental health treatment notes from Daymont Behavioral Health dated November, 2006, to April, 2008. (Tr. 552-78, 655-56). Those notes reveal that when a mental health therapist first evaluated Plaintiff, the therapist reported that Plaintiff appeared depressed and anxious. *Id.* The therapist identified Plaintiff's diagnoses as dependent personality disorder and anxiety disorder and he assigned Plaintiff a GAF of 50. *Id.* Over time, Plaintiff saw psychiatrist Dr. Siddiqi for medication management and a mental health therapist for counseling. *Id.*

Dr. Siddiqi reported in February, 2007, that Plaintiff had a restricted affect, a frustrated mood, anxiety and fear, auditory hallucinations, paranoia, idealism and suspiciousness, racing thoughts, angry outbursts, fear of dying, restlessness, and agitation. (Tr. 649-54). Dr. Siddiqi also stated that Plaintiff reported that he experienced panic attacks. *Id.* Dr. Siddiqi opined that Plaintiff was unable to meet competitive standards in remembering work-like procedures, maintaining attention for two hour segments, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, work in compliance with or proximity to others without being unduly distracted, make simple work related decisions, complete a normal workday or workweek without interruptions from psychologically-based symptoms, perform at a persistent pace without an unreasonable number of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with

co-workers or peers without unduly distracting them or exhibiting behavior extremes, respond appropriately to changes in routine work setting, and deal with normal work stress. *Id.* Dr. Siddiqi noted that Plaintiff had mild limitations in activities of daily living, but marked limitations in maintaining social functioning and maintaining concentration, persistence, or pace. *Id.* Dr. Siddiqi also noted that Plaintiff had an anxiety disorder and complete inability to function independently outside his home. *Id.*

Examining psychologist Dr. VandeCreek reported on April 2, 2009, that Plaintiff was extremely tangential but presented as a fairly consistent historian, attended developmentally handicapped classes in school, frequently engaged in physical fights with peers at school, and that his mother removed him from school in the seventh grade and attempted to home-school him but was unable to do so. (Tr. 657-63). Dr. VandeCreek also reported that Plaintiff had attempted to obtain his GED but was unsuccessful, was diagnosed with attention deficit disorder, hyperactive type, in the fourth grade, with social phobia, panic disorder, and some form of anxiety in 2004, and subsequently with bipolar II. *Id.* Dr. VandeCreek noted that Plaintiff was quite verbose and difficult to interrupt, his thought processes were quite tangential, his affect was anxious, and his overall insight and judgment were fair. *Id.* Dr. VandeCreek also noted that testing revealed that Plaintiff's full scale IQ was 58, his verbal IQ was 62, and his performance IQ was 59, and that his scores on the Vineland Adaptive Behavior Scales were "significantly below his overall intellectual functioning." *Id.* Dr. VandeCreek noted further that in comparing Plaintiff's current scores with his previous scores, the change in score may be due to the onset of serious mental illness and the effects of current prescription medication. *Id.* Dr. VandeCreek identified Plaintiff's diagnoses as mild mental retardation, bipolar disorder, social phobia, and panic disorder and he assigned Plaintiff a

GAF of 50. *Id.*

In his Statement of Errors, Plaintiff alleges that the Commissioner erred by acting as his own medical expert and substituting his opinion as to Plaitniff's IQ scores for the opinions of the treating and examining medical experts therefore improperly concluding that he does not satisfy the Listings, by failing to give controlling weight to the his treating physician's and  psychiatrist's opinions, and by relying on the VE's testimony which was in response to an improper hypothetical question. (Doc. 9).

In support of his first Error, Plaintiff essentially argues that the Commissioner erred by failing to find that he satisfies Listing 12.05.

A claimant has the burden of proving that his or her impairments meet or equal the Listings. *Bowen v. Yuckert,* 482 U.S. 319 (1987).  In order to meet the requirements of a listed impairment, the claimant must meet all of the elements of the listed impairment. *See, Hale v. Secretary of Health and Human Services,* 816 F.2d 1078, 1083 (6th Cir. 1987), *citing, King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984) (lack of evidence indicating the existence of all the requirements of Listing 1.05C provides substantial evidence to support the Secretary's finding that claimant did not meet the Listing).  It is not sufficient to come close to meeting the requirements of a Listing. *Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1989) (Secretary's decision affirmed where medical evidence almost establishes a disability under Listing 4.04(D)).

Listing 12.05 reads in part:

*Mental Retardation and Autism:*  Mental retardation refers to a significantly sub average general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)....
The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

10

>...
>
>>D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>>1. Marked restriction of activities of daily living; or
>>2. Marked difficulties in maintaining social functioning; or
>>3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05.

The regulations provide that a claimant will meet the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* one of the four sets of criteria...." *Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001) (citations omitted)(emphasis in original).

In determining that Plaintiff does not satisfy the Listings, Judge Lombardo essentially determined that Plaintiff did not satisfy the paragraph B criteria of Listings 12.04 and 12.06 or the paragraph D criteria of Listing 12.05.[1]  (Tr. 12). In addition, Judge Lombardo found that Plaintiff does not have a valid IQ score of 60 through 70 as required by Listing 12.05. (Tr. 13). Specifically, Judge Lombardo determined that the IQ scores of record are of questionable validity because Plaintiff does not have the required deficits in adaptive functioning, because the scores became lower with each successive application for benefits which Plaintiff filed. (Tr. 14).

As noted above, in August, 1990, a school psychologist administered the Stanford-Binet Intelligence Scale (4th Ed), when Plaintiff was ten years of age and the results

---

[1] The "paragraph B" criteria of Listings 12.04 and 12.06 and the "paragraph D" criteria of Listing 12.05 are identical.   20 C.F.R. Pt. 404 Subpt. P, App. 1 §§ 12.04B, 12.05D, 12.06B.

11

indicated that Plaintiff had a composite score of 76 and a verbal score of 64[2] which placed him in the "mildly mentally retarded range." In 1994, when Plaintiff was fourteen, psychologist administered the Wechsler Intelligence Scale for Children - III and the results indicated that Plaintiff had a verbal IQ of 66, a performance IQ of 66, and a full scale IQ of 64 again indicating that Plaintiff was in the mildly retarded range of intellectual functioning.  Dr. Bonds administered the WAIS-III in January, 2005, when Plaintiff was twenty-five and the results indicated Plaintiff had a full scale IQ of 68, a verbal IQ of 71, and a performance IQ of 70. Although Plaintiff's full scale IQ was in the sixties, Dr. Bonds opined that Plaintiff functioned in the borderline range of intelligence.  In October, 2005, Dr. Deardorff, reported that testing on the WAIS-III, revealed Plaintiff's full scale IQ was 62, his verbal IQ was 65, and his performance IQ was 64.  Dr. Deardorff supported Dr. Bonds' diagnosis of borderline intellectual functioning even though Dr. Deardorff opined that Plaintiff's IQ scores fell within the mildly mentally retarded range of intellectual functioning. Dr. Deardorff opined that while Plaintiff's tested IQ is slightly lower than would be expected based on his clinical presentation, it was consistent with his special education background and that Plaintiff's emotional factors may have interfered with his performance as he appeared to be of mildly retarded to borderline intelligence. Most recently, Dr. VandeCreek, reported that test results indicated that Plaintiff's his verbal IQ was 62,  his performance IQ was 59, and his full scale IQ was 58.

While it is true that since he first applied for benefits in October, 2002, Plaintiff's IQ scores became lower with each successive test, there is little, if any indication that the psychologists

---

[2] Pursuant to 20 C.F.R. Pt. 404, Subpt. 1, App.1 § 12.00 D, "[i]n cases, where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance and fill-scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."

who tested Plaintiff questioned the validity of those scores.  Dr. Bonds did not question the validity of the test results and noted that Plaintiff put forth good effort on tasks.  While Dr. Deardorff noted that Plaintiff's tested IQ was slightly lower than would be expected on the basis of his clinical presentation, he also noted that the results were consistent with Plaintiff's special education background. Although Dr. VandeCreek noted that Plaintiff's test scores may have been affected by the onset of serious mental illness or the effects of prescription medication, he also noted that they were consistent with his scores when he was fourteen years of age.

Because no mental health expert of record suggested that Plaintiff's IQ test results were invalid, the Commissioner did not have an adequate basis for rejecting those scores.  *See, Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994); *Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). However, assuming that Plaintiff's IQ scores do satisfy Listing 12.05D as Plaintiff alleges, Plaintiff still needs to satisfy the functional requirements of the Listing.  Stated differently, Plaintiff must establish that he has two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace;  (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05D.

Judge Lombardo determined that Plaintiff has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and that he has experienced no episodes of decompensation. (Tr. 12). Plaintiff has not challenged those findings which Judge Lombardo made.  (Doc. 9).

This Court concludes that the Commissioner did not err by failing to find that

13

Plaintiff satisfies Listing 12.05D.

Plaintiff argues next that the Commissioner erred by rejecting the opinions of treating physician Dr. Kinkopf and treating psychiatrist Dr. Siddiqi.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social Security Ruling[3] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and

---

FN 1.  Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

14

laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07, *citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an

ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In rejecting Dr. Siddiqi's and Dr. Kinkopf's opinions, Judge Lombardo questioned whether Dr. Siddiqi qualified as a treating physician and she rejected Dr. Kinkopf's opinion as to Plaintiff's alleged mental impairments because he is not a mental health professional. (Tr. 18). Additionally, Judge Lombardo found that both Dr. Siddiqi's and Dr. Kinkopf's opinions were based on Plaintiff's subjective complaints and were inconsistent with other substantial evidence in the medical record. *Id.*

The record reveals that during the period April 24 through October 29, 2007, Dr. Siddiqi, a psychiatrist at Daymont, treated Plaintiff on two occasions, September 24 and October 29, 2007. (Tr. 552-57). Nevertheless, in September, 2007, Dr. Siddiqi reported that she saw Plaintiff once a month. (Tr. 649). The Court will assume for purposes of this Report that extent and frequency of Dr. Sidiqqi's contact with Plaintiff qualifies her as a treating physician.

There is no dispute that Dr. Kinkopf is Plaintiff's primary care physician and is not a mental health expert. As such, Dr. Kinkopf's opinion about Plaintiff's alleged mental impairments is not entitled to controlling weight. *See,* 20 C.F.R. § 416.927(d)(5).

Although Dr. Sidiqqi essentially opined that Plaintiff is disabled by his mental impairments, that opinion is inconsistent with Dr. Sidiqqi's own office notes. For example, Dr. Sidiqqi reported that although Plaintiff had a restricted affect and depressed mood, he was alert,

16

cooperative, well groomed, maintained direct eye contact, had logical thought processes, and was alert and oriented. (Tr. 552-56). In addition, Dr. Sidiqqi relied on Plaintiff's subjective complaints and allegations in determining that Plaintiff is disabled. Specifically, Dr. Sidiqqi reported that Plaintiff complained of auditory hallucinations, had racing thoughts, demonstrated angry outbursts, and had a fear of dying. (Tr. 649). Although Dr. Sidiqqi reported those allegations as clinical findings, Dr. Sidiqqi's clinical notes do not reflect that Dr. Sidiqqi documented such objective clinical findings contemporaneously with Plaintiff's treatment.

Similarly, Dr. Kinkopf's opinion is not supported by his objective clinical findings. Specifically, a review of Dr. Kinkopf's office note reveals that they contain few objective clinical findings with respect to Plaintiff's alleged mental impairments. *See, e.g.,* Tr. 401-49; 505-51; 584-648.

Drs. Sidiqqi's and Kinkopf's opinions are inconsistent with the other evidence of record. For example, examining psychologist Dr. Bonds reported that although Plaintiff seemed nervous, his affect was broad and appropriate to thought content, he was alert and oriented, and had sufficient information, judgment, and reasoning abilities to make important decisions. Dr. Bonds assigned Plaintiff a GAF of 60 indicating, at most, moderate difficulties in the abilities to function. Likewise, examining psychologist Dr. Deardorff reported that, while Plaintiff appeared to be anxious and preoccupied with his difficulties, his flow of conversation and thought were normal and his judgment appeared to be sufficient for him to make decisions affecting his future and to conduct his own living arrangements efficiently. Finally, Dr. Sidiqqi's and Dr. Kinkopf's opinions are inconsistent with the reviewing mental health experts' opinions. *See,* Tr. 321-37; 456-73.

Under these facts, the Commissioner had an adequate basis for rejecting Dr. Sidiqqi's

and Dr. Kinkopf's opinions.

Plaintiff argues next that the Commissioner erred by relying on the VE's testimony because it was in response to an improper hypothetical question. Plaintiff's position is that the hypothetical question Judge Lombardo presented to the VE was improper because it did not include all of the limitations described by Drs. Sidiqqi and Kinkopf.

A hypothetical question must accurately portray the claimant's physical and mental impairments. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). If a hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints. *Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990); *see also, Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118 (6th Cir. 1994). A hypothetical question need only include those limitations accepted as credible by the ALJ. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1235 (6th Cir. 1993). A vocational expert's response to a hypothetical question that accurately portrays an individual's impairments constitutes substantial evidence for determining whether a disability exists. *Varley*, 820 F.2d at 779-80.

As noted above, the Commissioner had an adequate basis for rejecting Drs. Sidiqqi's and Kinkopf's opinions. Therefore, the Commissioner was not required to include in his hypothetical question to the VE the limitations which Drs. Sidiqqi and Kinkopf described.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a

verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

March 11, 2011.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).